UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌──────────────────────────────────────
│  USDC SDNY
│  DOCUMENT
│  ELECTRONICALLY FILED
│  DOC #:_____
│  DATE FILED:  8/25/2022
└──────────────────────────────────────
```

Rosa Maria Juarez,

                              Plaintiff,

              -against-

Kilolo Kijakazi,[1]

                              Defendant.

20-cv-09542 (SDA)

**OPINION AND ORDER**

**STEWART D. AARON, UNITED STATES MAGISTRATE JUDGE:**

Plaintiff Rosa Maria Juarez ("Juarez" or "Plaintiff") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security (the "Commissioner") that denied her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (Compl., ECF No. 1.) Presently before the Court are the parties' cross-motions, pursuant to Federal Rule of Civil Procedure 12(c), for judgment on the pleadings. (Pl.'s Not. of Mot., ECF No. 22; Comm'r Not. of Mot., ECF No. 29.) For the reasons set forth below, Plaintiff's motion for judgment on the pleadings is GRANTED, the Commissioner's cross-motion is DENIED and this action is remanded for further administrative proceedings.

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security, succeeding Commissioner Andrew Saul. Accordingly, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Court has substituted Kilolo Kijakazi in the caption in place of Andrew Saul. No further action need be taken to continue this suit. *See* 42 U.S.C. § 405(g).

## BACKGROUND

### I.  Procedural Background

Juarez filed an application for DIB on October 24, 2016 and an application for SSI on January 10, 2017, initially alleging a disability onset date of September 9, 2016. (Administrative R. ("R."), 244, 246.)[2] Juarez later amended her alleged onset date to May 1, 2016. (*See* R. 65.) The Social Security Administration ("SSA") denied her applications on March 6, 2017, and Juarez filed a written request for a hearing before an Administrative Law Judge ("ALJ") on April 28, 2017. (R. 87-88, 106, 150.) A video hearing was held on June 21, 2019 before ALJ Seth Grossman. (R. 32.) Juarez was represented at the hearing by attorney Marc Strauss. (*Id.*) In a decision dated August 8, 2019, ALJ Grossman found Juarez not disabled. (R. 21.) Juarez requested review of the ALJ's decision from the Appeals Council. (R. 241-43.) Her request for review was denied on September 8, 2020, making ALJ Grossman's decision the Commissioner's final decision. (R. 1-6.) This action followed.

### II.  Non-Medical Evidence

Born on May 4, 1971, Juarez was forty-four years old on the amended alleged disability onset date. (*See* R. 65, 244.) Juarez made it to the twelfth grade in high school. (R. 37.) She had past relevant work as a cashier/stock worker at various retail establishments and also briefly worked at a post office. (R. 346-51.) Juarez separated from her husband in 2016 and, at the time of the June 2019 hearing, was living with friends and her one son who, as of the hearing date, was twenty-one. (R. 38, 50.)

---

[2] The Administrative Record consists of documents filed at ECF Nos. 11 (R. 1-1074), 16 (R. 1075-1114) and 32 (R. 1115-1150).

III.   **Medical Evidence Before the ALJ**

A.   **Treatment Records Prior To The Alleged Onset Date**

On February 11, 2011, Dr. Philip Bao, performed a total gastrectomy[3] and Roux-en-Y esophagojejunostomy[4] on Juarez at Stony Brook University Hospital to treat gastric cancer. (R. 571-73.) There were no immediate complications. (*Id.*)

On May 20, 2014, Juarez was evaluated by Dr. Miguel Delgado, a psychiatrist, at John Mather Hospital where she was treated for depression and anxiety due to the continued pain from having her stomach removed three years earlier. (R. 512.) The doctor noted that she had been depressed and anxious creating symptoms of hopelessness, helplessness and poor sleep. (*Id.*) Her history of migraine headaches over many years forced her to take medications which her doctors suspected led to her stomach cancer. (*Id.*) Dr. Delgado diagnosed Juarez with major depressive disorder with moderate recurrence and anxiety disorder, and assigned a Global Assessment of Functioning ("GAF") score of 55, which evidenced moderate symptoms or difficult in functioning. (R. 514.) He placed her on psychotropic medication management. (*Id.*)

On July 1, 2015, Juarez was treated at John Mather Hospital Emergency Department for a seizure by Dr. Perry Shapiro, who diagnosed her with seizure disorder. (R. 445-48, 709-20.) Juarez had a seizure prior to arrival and reported having one the week prior that was untreated. (R. 713; *see also* R. 421.) A CT of the brain/head revealed no evidence of acute lobar infarction,

---

[3] "A gastrectomy is a surgery that involves the excision of all or part of the stomach." *Velez v. Comm'r of Soc. Sec.,* No. 16-CV-10036 (ER) (HBP), 2017 WL 6761925, at *1 n.4 (S.D.N.Y. Dec. 12, 2017) (citations omitted).

[4] An esophagojejunostomy is the "surgical removal of the stomach with connection of the esophagus directly to the jejunum portion of the small intestine." *Allison v. Bowen,* No. 87-CV-01556 (AET), 1988 WL 78158, at *2 (D.N.J. July 21, 1988).

intracranial hemorrhage or extra-axial collection. (R. 448, 717.) Juarez was prescribed Keppra to control the seizures. (R. 446.) Juarez was discharged on July 2, 2015, with plans to follow up with Dr. Anita Gill for outpatient treatment. (R. 715.)  The hospital did a CT scan and found no evidence of anything abnormal. (R. 717.) Juarez saw Dr. Gill for a follow-up appointment on July 23, 2015. (R. 421-23.) Dr. Gill continued Juarez on Keppra and advised her not to drive and also recommended over-the-counter medication for Juarez's migraine headaches. (R. 422.)

On August 5, 2015, Juarez returned to Dr. Delgado informing him of her seizures and that her neurologist discontinued Inderal [5] and started her on gabapentin for her restless leg syndrome.[6] (R. 697.) On examination, her psychiatric examination was normal except her affect was constricted. (*Id.*) On August 15, 2015, Juarez underwent an EEG by neurologist Dr. Katherine Roth, which was normal. (R. 442-43.)

On October 28, 2015, Juarez returned to Dr. Delgado with complaints of decreased sleep due to restless leg syndrome. (R. 698.) She requested a prescription for Inderal because she felt it had helped previously, which Dr. Delgado refilled. (R. 698-99.) Her psychiatric examinations remained the same from the prior visit. (*Id.*)

On January 20, 2016, Juarez went back to Dr. Delgado complaining that the restless leg syndrome continued with no relief from the Inderal. (R. 699.) The psychiatric evaluation

---

[5] Inderal is a type of beta-blocker that is used to treat tremors, chest pains, high blood pressure, heart rhythm disorders, and other heart or circulatory conditions. *Alonso v. Berryhill*, No. 17-CV-04769 (DF), 2018 WL 4997512, at *4 n.23 (S.D.N.Y. Sept. 27, 2018) (citing Inderal, https://www.drugs.com/inderal.html). It is unclear from the record when and by whom Inderal was prescribed.

[6] Restless Leg Syndrome is "a neurologic disorder that affects sensation and movement in the legs and causes the legs to feel uncomfortable." *See Regan v. Astrue*, No. 09-CV-02777 (BMC), 2010 WL 1459194, at *5 n.16 (E.D.N.Y. Apr. 8, 2010).

remained the same from her prior visit. (*Id.*) She agreed to stop taking Inderal and start a trial of Requip for the restless leg syndrome. (R. 700.) Juarez stated she was tolerating her other medications, so Dr. Delgado signed off on her prescriptions for Amitriptyline,[7] Ativan[8] and Lexapro.[9] (*Id.*)

On April 13, 2016, Juarez returned to Dr. Delgado reporting that she was feeling stressed over her health issues and work issues, but otherwise was doing pretty well. (R. 701.) Dr. Delgado noted that her primary symptoms of depression and anxiety had remained the same since her last visit. (*Id*.) Dr. Delgado further noted that Juarez had several medical issues that appeared to be causing her distress and disability and declined to complete disability papers, re-directing her to her primary doctor. (*Id.*)

On April 29, 2016, Juarez, complaining of abdominal pain, decreased appetite, and previous lightheadedness, chest pains and trouble breathing, was treated at Stony Brook Hospital by Dr. Jennifer Ng. (R. 491.) Upon arrival she was hypotensive[10] and near syncope.[11] (R. 485.) Initially, she appeared unresponsive but improved after fluids. (*Id.*) She was diagnosed with a

---

[7] Amitriptyline is an antidepressant and used to prevent migraine headaches. *See Segarra v. Comm'r of Soc. Sec.,* No. 20-CV-00557 (LTS) (BCM), 2021 WL 4526610, at *4 n.8 (S.D.N.Y. Sept. 14, 2021).

[8] Ativan is used to treat anxiety disorder and provides short-term relief for symptoms of anxiety caused by depression. *See Baez v. Saul,* No. 15-CV-04464 (NSR) (LMS), 2019 WL 5725047, at *3 n.10 (N.D.N.Y. Aug. 21, 2019).

[9] Lexapro is "a prescription antidepressant." *See Daniels-Feasel v. Forest Phar, Inc.,* No. 17-CV-04188 (LTS) (JLC), 2021 WL 6137093, at *1 (S.D.N.Y. Sept. 3, 2021).

[10] Hypotensive refers to "a drop in blood pressure that can cause lightheadedness or fainting." *See Stevens v. Rite Aid Corp.,* 851 F.3d 224, 227 n.2 (2d Cir. 2017).

[11] "Syncope is another term for fainting." *Revi v. Comm'r of Soc. Sec.,* No. 16-CV-08521 (ER) (DF), 2018 WL 1136997, at *9 n.34 (S.D.N.Y. Jan 30, 2018).

vasovagal episode[12] and kidney stones. (*Id.*) Her head CT scan, EKG and chest x-ray came back normal, but she was admitted for further observation and to rule out surgical emergency. (R. 491-92.)

### B.   Treatment Records Following The Alleged Onset Date

On June 29, 2016, Juarez visited Dr. John Brennan, an orthopedic surgeon, for complaints of knee pain in the front of both knees. (R. 895.) She demonstrated an elevated body mass index and presented with an antalgic gait.[13] (R. 896.) On exam, her knees were stable with an extension of 8 degrees and a flexion of 105 degrees. (*Id.*) Dr. Brennan diagnosed Juarez with osteoarthritis in both knees and took x-rays which showed some lateral patellar tilt in both knees. (*Id.*) Dr. Brennan's impression was there was chronic patellofemoral maltracking with possible occult internal derangement,[14] so he recommended an MRI. (*Id.*)

On July 14, 2016, Juarez visited Dr. Lorenzo Gamez, an orthopedic surgeon, for chronic foot pain in both feet worsened by weightbearing and walking. (R. 900.) She also complained of joint pain, abnormal bleeding and bruising, stomach burning and fatigue. (R. 901.) Bilateral foot x-rays revealed evidence of a healed toe fracture and osteoarthritis in her feet for which she received a steroid injection to the right toe with instructions for a follow up in two weeks for an injection in the other foot if there was relief. (R. 902.)

---

[12] These vasovagal episodes "occur[] when you faint because your body overreacts to certain triggers, such as sight of blood or extreme emotional distress." *Sanabria v. Comm'r of Soc. Sec.,* No. 20-CV-00906 (DF), 2022 WL 976874, at *9 n.16 (S.D.N.Y. Mar. 31, 2022).

[13] "Antalgic refers to counteracting or avoiding pain, as a posture or gait assumed so as to lessen pain." *DiPalma v. Comm'r of Soc. Sec.*, 951 F. Supp. 2d 555, 559 n.1 (S.D.N.Y. 2013) (citations omitted).

[14] "Chronic conditions which severely limit[] the patient's ability to walk and do similar activities . . . expected to worsen with time, and [] might need surgery for total knee replacement." *Emerick v. Saul*, No. 19-CV-02826 (AMD), 2020 WL 4504638, at *2 (E.D.N.Y. Aug. 5, 2020) (citations omitted).

On July 26, 2016, Juarez took an ambulance to the St. Charles Hospital's Emergency Department at 12:23 am because of a panic attack due to the pain from her back radiating from her abdomen. (R. 640.) Juarez stated that she was hyperventilating and had spasms in both hands. (*Id.*) Dr. Matthew C. Rutman examined Juarez and noted shortness of breath, anxiety and vomiting. (R. 641-42.) Her EKG and chest X-Ray came back normal (R. 643, 656), but her CT scan of the pelvis revealed kidney stones, an enlarged liver, an enlarged uterus and a contracted, thickened urinary bladder. (R. 654.)

On July 26, 2016, Juarez returned to Dr. Delgado complaining of persistent panic attacks causing abdominal pain and anxiety. (R. 703.) Her psychiatric examination presented mild psychomotor retardation,[15] a constricted affect, anxious mood and helplessness thought content. (*Id.*) Dr. Delgado took her off Ativan, increased her Lexapro dosage and prescribed Xanax. (*Id.*)

On August 8, 2016, Juarez visited St. Charles Hospital with complaints of abdominal pain causing vomiting. (R. 658.) She was stabilized and released for follow up with her gastroenterologist. (R. 661.)

On September 7, 2016, Juarez returned to St. Charles Hospital reporting a seizure and dizziness. (R. 670.) Juarez was directed to resume taking her psychoactive medications, instructed not to drive and to follow-up with neurology immediately. (R. 673.)

On September 12, 2016, Juarez visited neurologist Dr. Roth who found that the cranial nerves, motor exam, sensory exam, cerebellar testing, and gait were all normal. (R. 744.) Dr. Roth

---

[15] "Manifestations of psychomotor retardation include slowed speech, decreased movement, and impaired cognitive function. It is common in patients with melancholic depression and those with psychotic features." *Flinton v. Berryhill*, No. 19-CV-02054 (LGS) (DF), 2020 WL 5634462, at *7 n.26 (S.D.N.Y. Sept. 4, 2020) (citations omitted).

started Juarez on Depakote[16] and ordered an MRI. (*Id.*) Dr. Roth also recommended that Juarez

cease smoking and to lose weight. (*Id.*) On September 20, 2016, Juarez had an MRI, ordered by

Dr. Roth, which revealed a single, small, nonspecific signal abnormality in the brain likely from

reduced blood flow. (R. 755.)

On October 31, 2016, Juarez followed up with Dr. Roth who found that the cranial nerves

exam, motor exam, sensory exam, cerebellar testing and gait were all normal. (*Id.*) Juarez

reported difficulty walking, lower back pain and trouble sleeping. (*Id.*) Dr. Roth renewed her

prescription for Depakote and diagnosed carpal tunnel syndrome in the left arm. (*Id.*) On

November 22, 2016, Juarez followed-up with Dr. Delgado. (R. 704.) Juarez reported feeling stable

of medication and that she was not experiencing side effects, although Dr. Delgado noted she

appeared mildly sedated. (*Id*.) Dr. Delgado also noted that she had mild psychomotor retardation,

constricted affect and euthymic mood. (*Id.*)

On January 27, 2017, Juarez followed up with oncologist Dr. DaCosta who noted a normal

physical examination and continued iron and B12 deficiency secondary to malabsorption due

after gastrectomy, but the gastric cancer was in remission. (R. 567-69.)

On February 8, 2017, Dr. Brennan examined Juarez during her follow-up appointment for

knee pain and instability, which was worse over the prior year. (R. 904.) Dr. Brennan noted no

deformity on either knee but moderate fluid in the left knee and mild fluid in the right knee. (R.

905.) Range of motion was 5 degrees to 95 degrees in the left knee and 0 to 100 degrees in the

right knee. (*Id.*) However, the ligaments were stable and her motor was intact. (*Id.*) From the x-

---

[16] Depakote is "[a]n anticonvulsant medication that is also used to treat the manic phase of bipolar disorder (manic-depressive illness) and helps prevent migraine headaches." *Lopez v. Comm'r of Soc. Sec.*, No. 18-CV-07564 (JGK) (SDA), 2020 WL 364861, at *20 n.9 (S.D.N.Y. Jan. 4, 2020) (citations omitted).

rays, Dr. Brennan's overall impression was degenerative joint disease, so he administered steroid injections to both knees as conservative treatment given her age and seizure disorder. (*Id.*)

On March 6, 2017, Juarez reported to Dr. Roth that she had a seizure the night before. (R. 756.) Dr. Roth increased her dosage of Depakote and planned to do a follow-up level in a week. (*Id.*) On March 22, 2017, Juarez received her first Orthovisc[17] injections to the knees for her osteoarthritis, and on April 12, 2017, Juarez received her second injection. (R. 598, 602.)

On September 6, 2017, Juarez went to the Ryan Community Health Center and saw Dr. Crissaris Sarnelli complaining of lower back pain, abdominal pain, and chest pain. (R. 609.) Juarez reported that nearly every day she felt depressed or hopeless, bad about herself, tired or having little energy, had little interest in doing things, trouble falling asleep, trouble concentrating, and a poor appetite, she received a score of 23 on the PHQ-9 screening test,[18] which was indicative of severe depression. (*Id.*) Dr. Sarnelli referred her to a variety of other departments, noting that she had new insurance and needed follow-up. (R. 613.)

On November 17, 2017, Juarez saw Dr. Yiming Luo, a rheumatologist, complaining of foot pain and knee pain which she reported was at a 7. (R. 948-49.) Dr. Luo found the pain in Juarez's right big toe was more like a bunion with mild tenderness rather than gout and referred her to a podiatrist. (R. 950-51.) On December 7, 2017, Juarez saw Dr. Bryan Markinson, a podiatrist, who diagnosed a bunion of her right toe and suggested surgery. (R. 940.) However, Juarez was

---

[17] Orthovisc is "a solution of sodium hyaluronate, a thick (viscous) substance that is naturally present in the knee joint . . . [injected] to relieve pain from osteoarthritis." *Gaiser v. Comm'r of Soc. Sec.*, No. 13-CV-08234 (HBP), 2015 WL 3536604, at *4 n.16 (S.D.N.Y. June 5, 2015) (citations omitted).

[18] "PHQ-9 refers to a self-administered patient health questionnaire that is used to assess and monitor the severity of a patient's depression and/or anxiety." *Alas v. Comm'r of Soc. Sec.*, No. 19-CV-00430 (VSB) (BCM), 2022 WL 8817607, at *22 n.5 (S.D.N.Y. Feb. 25, 2020) (citations omitted).

homeless, and thus was not able to commit to the rigors of recovery. (R. 940.) Therefore, the doctor recommended wider width footwear. (*Id.*)

On January 8, 2018, Juarez returned to Dr. Sarnelli for referrals to a neurologist, cardiologist, urologist and oncologist. (R. 863-65.) Juarez was having trouble sleeping and had muscle spasms on both sides of the ribs. (*Id.*) Dr. Sarnelli prescribed Cyclobenzaprine for the muscle spasms, Zolpidem for the insomnia, and started Juarez on Amlodipine for essential hypertension. (R. 864.) Juarez scheduled a two-week follow-up. (*Id.*)

On January 22, 2018, Juarez returned to Dr. Sarnelli for a follow-up on her medication. (R. 860-61.) On the PHQ-9 test, she scored a 25 indicating severe depression. (*Id.*) Her previous psychiatrist had discontinued treatment and referred her to her primary care doctor for follow up on medication. (*Id.*) Dr. Sarnelli prescribed Zolpidem[19] and increased Amitriptyline for her restless leg syndrome which was affecting her sleep. (R. 861.)

On June 13, 2018, a physician assistant at Mount Sinai Roosevelt Hospital wrote a letter stating Juarez was awaiting medical clearance for a knee replacement surgery and advised to minimize her transportation. (R. 633.)

On June 20, 2018, Juarez visited Family Nurse Practitioner ("FNP") Kate Mannion ("FNP Mannion") at Ryan Community Health Center for a physical and complained of discoloration of her calves, dizziness and insomnia. (R. 856.) On the PHQ-9 test, she scored a 24 indicating severe depression. (*Id.*) Juarez reported compliance with her prescribed medication, but she was not taking her Amlodipine and took excessive amounts of Tylenol PM (*Id.*) She reported that her

---

[19] Ambien, or Zolpidem, is used to treat insomnia. *See Faison v. Comm'r of Soc. Sec.,* No. 18-CV-10146 (ER) (SDA), 2020 WL 2951008, at *4 n.9 (S.D.N.Y. Jan. 4, 2020).

restless leg syndrome was not controlled on Elavil, and she was feeling very worn out due to not sleeping. (*Id.*) In the morning, she was dizzy, saw floaters and felt tightness in her chest that improved as she woke up. (*Id.*) Juarez's examination of cranial nerves, gait and range of motion came back normal. (R. 857.) FNP Mannion found Juarez had tenderness in the left lower quadrant of the abdomen without rebound tenderness, impaired circulation due to mottling to back of legs, uncontrolled hypertension and severe depression. (*Id.*) FNP Mannion ordered imaging, refilled the Amlodipine for the hypertension, and referred Juarez to a social worker for the depression. (*Id.*)

On July 5, 2018, Juarez returned to Dr. Sarnelli to receive lab results and updated referrals. (R. 853.) On the PHQ-9 test, Juarez scored a 27 indicating severe depression. (*Id.*) Dr. Sarnelli found Juarez had impaired circulation, so she prescribed Simvastatin [20] and ordered an ultrasound for the lower extremities with a follow-up in three months. (R. 855.)

On July 9, 2018, neurologist Dr. Mark Barber evaluated Juarez's seizure disorder to clear her for knee replacement surgery (R. 929-30.) There was pain in Juarez's lower extremities limiting her strength test, and her gait was narrow based and steady but slow with obvious signs of transfer of weight from side to side since she was unable to walk on her toes or heels. (R. 932.) Dr. Barber noted that Juarez maintained good attention, her memory and sensations were intact, and her reflexes were 3+. (*Id.*) She had normal muscle bulk/tone and full (5/5) strength throughout. (*Id.*) Dr. Barber wanted to obtain ferritin levels, an EEG, MRI, CBC, CMP, bHCG, and follow-up with an AED for the seizures. (R. 933.) He counseled environmental modifications and

---

[20] Simvastatin is a medication used "to help lower 'bad' cholesterol and fats . . . and raise 'good' cholesterol in the blood." *See Byrd v. Kijakazi*, No. 20-CV-04464 (JPO) (SLC), 2021 WL 5828021, at *23 n.11 (S.D.N.Y. Nov. 12, 2021) (citations omitted).

not to take more than the recommended dose of Excedrin while awaiting brain imaging for further medical intervention. (*Id.*) Juarez was to return in two months. (R. 935.)

A July 13, 2018 ultrasound of the abdomen, ordered by FNP Mannion, revealed a prominent liver with fatty infiltration limiting detailed architectural evaluation indicating a need for a CT scan. (R. 746.) The scan also showed kidney stones in both kidneys. (*Id.*) A July 23, 2018 ultrasound of the lower extremities, ordered by Dr. Sarnelli, was normal. (R. 749.) An August 14, 2018 CT scan of the abdomen, ordered by FNP Mannion, revealed accumulation of fat in the liver with a nodular lesion, kidney stones in both kidneys, a fat-containing umbilical hernia and inflammation in the lower lobe of the left lung. (R. 753.)

On August 15, 2018, Juarez returned to Dr. Barber for medication and complaints of restless leg syndrome. (R. 922-23.) She explained that the symptoms would start at 7 p.m. and last throughout the night allowing only 30 minutes of real sleep. (R. 923.) She had a narrow based and slow gait and she was unable to walk on her heels and toes. (R. 924.) Her EEG and MRI were normal, so Dr. Barber was less concerned about the seizures after the negative work-up and prescribed Ropinirole since it helped in the past. (R. 924-25.) However, Dr. Barber noted that Juarez's restless leg syndrome had become "severely disabling." (R. 925.) She continued to have daily headaches, which Dr. Barber felt could be due to medication overuse and counseled lifestyle modifications. (*Id.*)

On September 12, 2018, Juarez returned to Dr. Sarnelli with complaints of jaw and shin pain. (R. 848.) On the PHQ-9 test, Juarez scored a 24 indicating severe depression. (*Id.*) Dr. Sarnelli noted that she had leg pain due to varicose veins in both legs and referred her for surgical evaluation. (R. 849-50.)

On October 10, 2018, Dr. Barber examined Juarez, who reported that the Ropinirole had not helped with her restless leg syndrome. (R. 916.) She explained that she was sleeping 1.5 hours at night and could not lie down without experiencing symptoms. (*Id.*) She also reported having headaches for which she took ten Excedrin a day despite Dr. Barber's previous counseling. (*Id.*) Juarez complained of a return of carpal tunnel syndrome symptoms, including pain in both hands and numbness that was worse upon awakening. (*Id.*) She walked with a cane and was unable to walk on her toes or heels due to pain. (R. 917.) Dr. Barber noted that Juarez's restless leg syndrome was not responding to Ropinirole as it had in the past, so he increased the dosage and counseled her to avoid Excedrin due to the caffeine in the medication. (R. 918.) Dr. Barber prescribed Topamax for her headaches and advised Juarez to stop overusing over-the-counter medication. (*Id.*)

On October 16, 2018, Juarez returned to Dr. Sarnelli for prescription refills. (R. 845.) Juarez had a PHQ-9 score of 24 Indicating severe depression. (*Id.*) Juarez received exercise and dietary counseling as well as a refill of Lorazepam for her anxiety. (R. 847.)

On November 28, 2018, Juarez visited Dr. Brian Williams for surgical evaluation and complained of bilateral knee pain. (R. 991-93.) She reported that she was able to walk three to four blocks, and Dr. Williams noted that her gait was mildly antalgic. (*Id.*) She had full motor power in her legs and her sensations were intact. (*Id.*) Dr. Williams planned a course of physical therapy, referred her to a nutritionist, discontinued non-steroidal anti-inflammatory drugs ("NSAIDs"), and ordered medial unloader braces. (*Id.*) Juarez deferred steroid injections. (*Id.*)

On March 25, 2019, Juarez followed-up with Dr. Williams and reported continued pain in her knees, but stated that she had not gone to physical therapy. (R. 994.) She could walk 4-5

blocks with the use of a cane. (*Id.*) Dr. Williams noted that her gait was non-antalgic. (*Id.*) She had multiple tender points throughout her knee and lower extremities and full motor strength in her lower extremities with 0-125 degrees of motion in both knees. (*Id.*) Treating the knee pain secondary to osteoarthritis, Dr. Williams ordered a course of physical therapy, Tylenol as needed, weight loss, continued use of her braces, an adjustable cane and follow-ups. (R. 994-95.)

On April 30, 2019, Juarez started physical therapy for her knee complaints. (R. 1059.) The physical therapist, Richelle Colmenares, PT, CMTP ("PT Colmenares"), assessed that pain and swelling continued to limit overall functional mobility, but Juarez was able to do day-to-day tasks. (R. 1060-61.) PT Colmenares noted that Juarez's rehab potential was good, but advised her to be more compliant with therapy and the home exercise program to improve her condition. (R. 1061.)

On June 12, 2019, Juarez went back to physical therapy and reported being able to walk ten city blocks with a cane before needing to rest. (R. 1063.) The physical therapist, Jeffrey Chow, DPT ("DPT Chow"), noted with respect to her functional limitations that Juarez could tolerate sitting for 30 minutes and standing for less than 30 minutes. (*Id.*) DPT Chow assessed that Juarez presented degenerative joint disease induced knee pain and swelling. (R. 1064.) She had increased connective tissue restriction surrounding her knees and legs. (*Id.*) She had increased right lower extremity patella tracking and demonstrates weakness in both quads. (*Id.*) Juarez ambulated with antalgic gait, but her rehab potential remained good. (*Id.*)

On June 14, 2019, Juarez went back to physical therapy and continued to complain of leg and knee pain with intermittent swelling. (R. 1066.) The physical therapist, PT Colmenares, reported the same functional limitations as at the June 12, 2019 visit. (*Id.*) Juarez ambulated with antalgic gait, but her rehab potential remained good. (R. 1067.)

On June 18, 2019, Juarez visited Dr. Sarnelli for a physical therapist referral. (R. 1069.) She also claimed she fell asleep at a previous doctor's office, and the provider tried to wake her up several times to no avail which has happened before at home. (*Id.*) She complained of lack of sleep from continued restless leg syndrome and of lightheadedness, dizziness, black floaters and swelling of the legs. (*Id.*) Juarez PHQ-9 score was 21 indicating severe depression. (*Id.*) Dr. Sarnelli's assessment included exercise counseling, dietary counseling, restless leg syndrome, chronic pain, back pain and vitreous floaters. (R. 1070.) Dr. Sarnelli started her on Gabapentin for the restless leg syndrome and referred Juarez to a physical therapist and an ophthalmologist with a follow-up in two weeks. (*Id.*)

## C. Medical Opinions

### 1. January 31, 2017 Disability Assessment– Dr. Noshir DaCosta, MD

On January 31, 2017, Juarez's oncologist, Dr. DaCosta, submitted a disability assessment, noting that Juarez's gastric cancer was in remission and there was no evidence of disease. (R. 561-564.) Dr. DaCosta did not complete the remainder of the assessment, noting that he was unable to provide a medical opinion regarding Juarez's ability to do work-related activities. (R. 564.)

### 2. February 10, 2017 Internal Medicine Consultative Examiner – Dr. Andrea Pollack, MD

On February 10, 2017, Dr. Andrea Pollack, a consultative examiner, examined Juarez at the request of the Division of Disability Determination. (R. 586-89.) Juarez reported having high blood pressure, a seizure disorder, gout [21] in her right foot, bilateral knee pain, arthritis,

---

[21] "Gout is characterized by a raised but variable blood uric acid level, recurrent acute arthritis of sudden onset, deposition of crystalline sodium urate in connective tissues and articular cartilage, and progressive

abdominal pain, nausea, repeated kidney stones, migraine headaches, and an iron and B12 deficiency. (R. 584-85.) Dr. A. Pollack noted that Juarez was tremulous throughout the examination, walked with a slight limp and could not walk on her heels or toes. (R. 586.) Her stance was normal and could squat 1/3 of full and needed no assistance getting on or off of the examination table, used no assistive device, did not need help changing and was able to rise from the chair without difficulty. (*Id.*) Dr. A. Pollack noted multiple linear scars on her forearms, and she was unable to lay back due to pain in her abdomen. (*Id.*) The examination showed normal functions of the cervical spine, while the lumbar spine, hips and knees had limitations in flexion. (*Id.*) She did not have any sensory deficits. (*Id.*) Juarez's hand and finger dexterity, along with her upper and lower extremities, showed full (5/5) strength. (*Id.*) Dr. A. Pollack diagnosed Juarez with hypertension; seizure disorder; gout; bilateral knee pain; kidney stones; migraine; iron and B12 deficiencies; and decreased visual acuity in both eyes. (*Id.*) X-rays of the left knee revealed mild patellofemoral degenerative joint disease. (R. 589.)

Dr. A. Pollack opined that Juarez had the following functional limitations: a moderate to marked restriction in squatting; a moderate restriction in bending, lifting, carrying, pushing, pulling, reaching, walking, standing, climbing stairs and kneeling; and a mild restriction in sitting. Dr. A. Pollack further opined that she should avoid heights, operating heavy machinery, activities which require heavy exertion, and activities which may put her at risk for fall and that she was restricted in activities require fine visual acuity bilaterally. (R. 588.)

---

chronic arthritis." *Dotson v. Shalala*, No. 92-CV-9052 (JFK), 1994 WL 164049, at *5 (S.D.N.Y. Apr. 21, 1994) (citations omitted).

### 3.   February 24, 2017 Psychiatric Consultative Examiner – Dr. Paul Herman, Ph.D.

On February 24, 2017, Dr. Paul Herman, a consultative examiner, performed a psychiatric evaluation on Juarez at the request of the Division of Disability Determination and concluded that Juarez had a chronic adjustment disorder with mixed anxiety and depressed mood. (R. 591-95.) Dr. Herman found Juarez did "not appear to have psychiatric problems that would interfere with her ability to function in the work setting, but in terms of her quality of life and coping skills, she may benefit from treatment for one year." (R. 594.) He also found that Juarez would "not be able to manage her own funds due to her self-reported some inconsistency in her functioning." (*Id.*)

### 4.   March 3, 2017 Disability Determination Evaluator – Dr. S. Bhutwala, Ph.D.

On March 3, 2017, upon review of the record, Dr. S. Bhutwala submitted a mental residual functional capacity ("RFC") assessment, in which he opined that Juarez was moderately limited in her ability to understand, remember and carry out detailed instructions and respond appropriately to changes in the work setting; however, he found that she otherwise was not significantly limited in any other ability. (R. 83-84.) Dr. Bhutwala further opined that Juarez retained the ability to perform the basic requirements of unskilled work on a sustained basis. (R. 85.)

### 5.   September 10, 2018 Assessment – Dr. Ralph Heiss

On September 10, 2018, Dr. Ralph Heiss conducted an examination and assessment of Juarez as part of a FEDCAP WeCare evaluation.[22] (R. 978-83.) Upon examination, Dr. Heiss found that Juarez had exertional limitations in lifting, pulling, pushing, carrying, stopping, bending and

---

[22] As noted by the Commissioner, FEDCAP WeCARE is an New York City Human Resources Administration program to provide assistance and services to cash assistant clients. (Comm'r Mem. at 3 n.4.)

reaching, as well as non-exertional emotional limitations. (R. 982-83.) With respect to Juarez's functional capacity, he opined that Juarez was unable to work and that she had severe degenerative joint disease. (R. 987-88.)

## IV.    The January 16, 2019 Administrative Hearing

Juarez appeared with counsel for an administrative hearing on January 16, 2019 before ALJ Grossman. (R. 1075-1114.)

### A.    Plaintiff's Testimony

Juarez testified at the January 16, 2019 hearing that she was depressed all the time because of the pain she experienced and that she felt hopeless and wanted to die. (R. 1088-1091.) She testified that she was seeing a psychiatrist but that her psychiatrist referred her to her other physicians because the depression stemmed from the medical issues. (R. 1091.) Juarez testified that she had had stomach cancer, which resulted in the removal of her whole stomach in 2011 and that the cancer was gone, but all of her current problems started after the surgery. (R. 1092-93.) Juarez testified that she also had kidney stones, migraines that lasted all day and restless leg syndrome, which caused her legs to tingle and tremble constantly. (R. 1094, 1095.) Juarez also testified that she was receiving cream as a treatment for the arthritis in her knees. (R. 1095.)

Juarez said that she could sit for approximately 10 to 15 minutes and that she could not perform a job where she would be sitting most of the day because her legs would get numb and tingling and her knee would get stiff and she would have to get up and move. (R. 1098.) She further testified that she was most comfortable lying down and sitting up because of pain in her back and sides and that she had been using a cane since 2016. (R. 1098-99.)

### B.    Medical Expert Testimony – Dr. Hugh Savage, MD

Medical expert, Dr. Hugh Savage, who was board-certified in cardiology and internal medicine, also testified at the hearing at the request of the ALJ. (R. 1081, 1103; Pl.'s Mem. at 12.) Dr. Savage had neither treated nor examined Juarez prior to testifying, but had reviewed the medical record up to the time of the January 16, 2019 hearing, which included Exhibits 1F through 36F.[23] (R. 18, 1079, 1102.) Dr. Savage testified that Juarez had gout, seizure disorder, migraines, kidney stones, bilateral knee arthritis, hypertension and a history of stomach cancer and surgery. (R. 1106.) He opined that Juarez's impairments did not meet or equal any listing, but found that Juarez was limited to sedentary work with no restriction to sit except for normal breaks to get up and move around. (R. 1110-11.) Upon questioning by Juarez's attorney, Dr. Savage noted that he did not take into account Juarez's psychiatric impairments. (R. 1109.)

### V.    The June 21, 2019 Administrative Hearing

Juarez appeared with counsel for a supplemental administrative hearing on June 21, 2019 before ALJ Grossman. (R. 31-71.)

### A.    Plaintiff's Testimony

Juarez testified that she had been unable to work since October 2016 because she started having seizures and pain in her legs due to restless leg syndrome. (R. 38-39.) Juarez further testified that she had a tingling sensation in both her legs that she could not control which caused her legs to shake. (R. 40.) Although she was on medication, she testified it made her "more sleepy,

---

[23] During his testimony, Dr. Savage initially testified about the wrong claimant and later stated that his own notes were not complete enough for him. (R. 1103, 1105.)

drained and tired, you know, a little bit out of it." (R. 40-41.) Juarez testified she could sit for "like twenty to thirty minutes" before she had to get up because of her restless legs. (R. 43-44.)

Juarez also testified that she had problems with her left foot and both knees, and that a doctor said she needed knee replacement surgery. (R. 39-40.) However, she could not have surgery because she did not have a permanent place to live. (R. 40.) Juarez further testified her knees were still in pain, but she was going to physical therapy. (R. 42.) Juarez testified she could stand "probably fifteen/twenty minutes" and walk "possibly five/six blocks" taking her time. (R. 44.) She testified that she had to take a taxi service rather than public transportation due to the stairs. (*Id.*)

Juarez further testified she had dumping syndrome in which she would get "a lot of pain" after she ate since her stomach was removed and could not take any medication for it. (R. 42.) Juarez testified that every day she had "headaches, nausea, dizziness," and black floaters, and her medicine made her drowsy. (R. 44-47.) Juarez testified that due to all her medical conditions she was depressed for which she was on medication. (R. 49.)

**B.      Medical Expert Testimony – Dr. Debra A. Pollack, M.D.**

Medical expert, Dr. Debra Pollack, also testified at the hearing at the request of the ALJ. (R. 35; Pl.'s Mem. at 12.) Dr. D. Pollack, a board-certified neurologist, had neither treated nor examined Juarez prior to testifying, but she reviewed the medical record up to the date of her testimony (Exhibits 1F through 42F). (R. 35, 64.) Dr. D. Pollack testified that Juarez's neurological impairments included headaches, restless leg syndrome and seizures in the past. (R. 51.) Dr. D. Pollack noted that Juarez complained of daily headaches and restless leg syndrome nightly and that she believed Juarez's neurological impairments equaled Listing 11.02(D) (Epilepsy). (R. 52.)

Dr. D. Pollack explained that she felt Juarez equaled this listing as a framework because of the episodic nature of her neurological problems. (*Id*.) Dr. D. Pollack testified that the pain associated with daily headaches and the lack of sleep would contribute to limitations in the ability to concentrate and maintain pace. (R. 54.) She further testified that Juarez's RFC would be, at most, sedentary work with a cane and that her daily headaches and lack of sleep would contribute to her inability to concentrate and maintain pace. (R. 52, 54.) Dr. D. Pollack also stated that Juarez may need unscheduled breaks for headaches, that she could sit for 8 hours in an 8-hour workday, and that she could stand and walk 20 minutes at a time but no more than 1 hour in an 8-hour workday. (R. 55-56.) Dr. D. Pollack also testified that the Gabapentin, Topamax and Ropinirole medications Juarez took could cause an individual to be drowsy, tired and out of it. (R. 62-63.)

### C.  Vocational Expert Testimony

Vocational Expert ("VE") Mary Anderson also testified at the June 21, 2019 hearing. (R. 66-70.) ALJ Grossman asked the VE to consider a hypothetical individual with Juarez's "educational and vocational background who can do a full range of sedentary work, except that [the individual is] limited to one hour standing and walking, total, and no more than twenty minutes at a time and afterwards needs a five minute [break]." (R. 67.) The VE confirmed that under this hypothetical, this individual could have a job. (*Id*.) The VE testified that the hypothetical individual could do certain jobs with an SVP[24] of 2 that are "simple task instruction jobs" and can be done with a cane. (R. 68-69.) The VE testified that the hypothetical person could

---

[24] "'SVP' stands for 'specific vocational preparation,' and refers to the amount of time it takes an individual to learn to do a given job . . . SVP uses a scale from 1 to 9 and the higher the SVP number the greater the skill required to do the job." *Urena-Perez v. Astrue*, No. 06-CV-02589 (JGK) (MHD), 2009 WL 1726217, at *20 (S.D.N.Y. Jan. 6, 2009) (citations omitted), *report and recommendation adopted as modified*, 2009 WL 1726212 (S.D.N.Y. June 18, 2009).

work the following jobs: an election clerk, a document preparer, and an addressing clerk. (*Id.*) The VE further testified that the customary allowance for these jobs was ten percent of the workday and absenteeism was no more than one day a month on a consistent basis. (R. 69.)

## VI.   ALJ Grossman's Decision and Appeals Council Review

Applying the Commissioner's five-step sequential evaluation, *see infra* Legal Standards Section II, the ALJ found at step one that Juarez had not engaged in substantial gainful activity since May 1, 2016, the alleged disability onset date. (R. 12.) At step two, the ALJ determined that the following impairments were severe: "restless leg syndrome, migraines, degenerative joint disease of the knees, and depression and headaches." (*Id.*) At step three, the ALJ found that Juarez did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*) The ALJ specifically considered listings in sections 1.02, 11.04 and 12.04. (*Id.*) He found that Juarez's mental impairment did not meet the standards for "paragraph B" in Listing 12.04 in which "a mental impairment must result in at least one extreme or two marked limitations in a broad area of functioning which are: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing themselves. (R. 13.) The ALJ only found mild or moderate limits in these domains and found "paragraph C" of the listing also was not satisfied. (*Id.*) Thus, he found she does not meet or equal the criteria for the listing. With respect to Listing 11.02, the ALJ noted that the neurological expert, Dr. D. Pollack, testified that Juarez equaled Listing 11.02, but determined that there was no direct evidence establishing the criteria and noted that Dr. Pollack also testified that Juarez could do

sedentary work. (R. 13.) Accordingly, the ALJ found that Juarez did not meet or equal Listing 11.02. (*Id*.)

The ALJ then assessed Juarez's RFC, determining that she could perform sedentary work "except she is limited to standing and walking 1-hour total for 20-minutes at a time which she would need a 5-mnute [sic] break." (R. 14.) The ALJ noted that "the cane she uses would not be necessary in an office setting, but the vocational expert testified that jobs are fine with the use of a cane." (*Id.*) The ALJ found Juarez could perform job functions "all within normal work expectations." (*Id.*) The ALJ noted that, while he found "[Juarez's] medically determinable impairments could reasonably be expected to cause the alleged symptoms," he also found "[Juarez's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence in the record . . ." (*Id.*) In evaluating Juarez's subjective complaints, the ALJ considered Juarez's engagement in daily activities and interaction, the clinical and laboratory evidence, the medical opinions, and Juarez's testimony and found Juarez could perform a good range of sedentary work. (R. 14-20.)

Upon consideration of the medical opinion evidence, the ALJ assigned some weight to Dr. Bhutwala's opinion in the Disability Determination Explanation that Juarez had a moderate limitation in her ability to adapt or manage oneself (*see* R. 78-79), noting this assessment was consistent with the evidence at the time of the opinion and with the ALJ's findings. (R. 17.) However, the ALJ found that Juarez had moderate limitations for concentration, persistence and pace, which were greater than that found by Dr. Bhutwala. (*Id*.; *see also* R. 79.)

The ALJ assigned "good weight" to consultative examiner Dr. Herman's opinion, which found no evidence of limitations in Juarez's ability to understand, remember and apply simple

directions and instructions; understand, remember and apply complex directions and instructions; use reason and judgment to make work-related decisions, interact adequately with supervisors, coworkers and the public; sustain concentration and perform a task at a consistent pace; sustain an ordinary routine and regular attendance at work; regulate emotions, control behavior and maintain wellbeing; maintain personal hygiene and appropriate attire; and be aware of normal hazards and take appropriate precautions. (R. 17.) The ALJ found that Dr. Herman "gave the claimant a thorough examination the results of which were normal" and further noted that the fact that Juarez was not under a physician's care for psychiatric treatment mitigated against a finding of a disabling psychiatric condition despite the PHQ-9 scores. (R. 17-18.)

Next, the ALJ assigned some weight to the opinion of internal medicine consultative examiner Dr. A. Pollack, but found Juarez did not have the limitations Dr. A. Pollack assigned because Dr. A. Pollack did not give a function-by-function breakdown leaving her assessment "open for interpretation." (R. 18.) The ALJ also noted that Dr. A. Pollack's opinion could be read to exclude or allow for sedentary work, thus the ALJ assigned the opinion limited weight. (*Id.*)

The ALJ gave significant weight to the impartial medical expert Dr. Savage because he was an expert in the field in cardiology, internal medicine, and SSA functionality and he supported his testimony and opinion by citing from the record and his opinion was consistent with the totality of the evidence. (R. 18.) The ALJ noted, however, that more evidence was added to the record by the time of the second hearing that Dr. Savage did not evaluate. (*Id.*)

Finally, although Dr. D. Pollack, an impartial medical expert, testified Juarez met Listing 11.02, the ALJ disagreed because the opinion was not in accord with the evidence. (R. 18.) The

ALJ stated that "[t]he claimant does not meet 11.02, because she does not have the requisite amount of seizures despite adherence to prescribed treatment, and she can do a good range of sedentary work." (*Id.*) The ALJ noted that there was "nothing sufficiently unique" about Juarez's cases to justify a finding that she equaled the listing. (*Id*.) However, the ALJ stated that he agreed with Dr. D. Pollack that Juarez could do sedentary work. (*Id.*)

Moving on to step four, the ALJ found that Juarez had past relevant work as a cashier and a fast-food worker, both of which are "light" and Juarez is limited to sedentary work. (R. 20.) Therefore, the ALJ found Juarez was unable to perform her past relevant work. (*Id.*)

At step five, the ALJ considered Juarez's age, education and job skill, along with the RFC determination, and, based on testimony from the VE, concluded there were jobs that exist in significant numbers in the national economy that Juarez can perform, including an election clerk, a document preparer, and an addressing clerk. (R. 20-21.) Therefore, the ALJ found that Juarez was not disabled during the relevant period and denied her claim for benefits. (R. 24.)

Following the ALJ's decision, Juarez sought review from the Appeals Council, which denied her request on September 8, 2020. (R. 1-6.)

## LEGAL STANDARDS

### I.   Standard Of Review

A motion for judgment on the pleadings should be granted if it is clear from the pleadings that "the moving party is entitled to judgment as a matter of law." *Burns Int'l Sec. Servs., Inc. v. Int'l Union, United Plant Guard Workers of Am., Local 537*, 47 F.3d 14, 16 (2d Cir. 1995) (citing Fed. R. Civ. P. 12(c)). In reviewing a decision of the Commissioner, a court may "enter, upon the

pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision

of the Commissioner ... with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

"The Court first reviews the Commissioner's decision for compliance with the correct legal

standards; only then does it determine whether the Commissioner's conclusions were supported

by substantial evidence." *Ulloa v. Colvin*, No. 13-CV-04518 (ER), 2015 WL 110079, at *6 (S.D.N.Y.

Jan. 7, 2015) (citing *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999)). "Even if the Commissioner's

decision is supported by substantial evidence, legal error alone can be enough to overturn the

ALJ's decision[.]" *Id.*; *accord Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987). A court must set

aside legally erroneous agency action unless "application of the correct legal principles to the

record could lead only to the same conclusion," rendering the errors harmless. *Garcia v. Berryhill*,

No. 17-CV-10064 (BCM), 2018 WL 5961423, at *11 (S.D.N.Y. Nov. 14, 2018) (quoting *Zabala v.

Astrue*, 595 F. 3d 402, 409 (2d Cir. 2010)).

Absent legal error, the ALJ's disability determination may be set aside only if it is not

supported by substantial evidence. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (vacating

and remanding ALJ's decision). "Substantial evidence is 'more than a mere scintilla. It means such

relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*,

402 U.S. 389, 401 (1971)). However, "[t]he substantial evidence standard is a very deferential

standard of review—even more so than the clearly erroneous standard, and the Commissioner's

findings of fact must be upheld unless a reasonable factfinder *would have to conclude

otherwise.*" *Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), *as amended* (Apr. 30, 2019)

(summary order) (emphasis in original) (citation and internal quotation marks omitted). If the

findings of the Commissioner as to any fact are supported by substantial evidence, those findings

are conclusive. *Diaz v. Shalala*, 59 F.3d 307, 312 (2d Cir. 1995).

**II.     Determination Of Disability**

A person is considered disabled for benefits purposes when she is unable "to engage in

any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months . . . " 42 U.S.C. §§

423(d)(1)(A), 1382c(a)(3)(A).

> [A]n individual shall be determined to be under a disability only if his physical
> or mental impairment or impairments are of such severity that he is not only
> unable to do his previous work but cannot, considering his age, education, and
> work experience, engage in any other kind of substantial gainful work which exists
> in the national economy, regardless of whether such work exists in the immediate
> area in which he lives, or whether a specific job vacancy exists for him, or whether
> he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In determining whether an individual is disabled, the Commissioner must consider: "(1)

the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective

evidence of pain or disability testified to by the claimant or others; and (4) the claimant's

educational background, age, and work experience." *Mongeur v. Heckler*, 722 F.2d 1033, 1037

(2d Cir. 1983) (per curiam) (citations omitted).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating

disability claims:

> (i) At the first step, we consider your work activity, if any. If you are doing
> substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . [continuous period of 12 months], or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 [(the "Listings")] . . . and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (internal citations omitted).

If it is determined that the claimant is or is not disabled at any step of the evaluation process, the evaluation will not progress to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). After the first three steps (assuming that the claimant's impairments do not meet or medically equal any of the Listings), the Commissioner is required to assess the claimant's RFC "based on all the relevant medical and other evidence in [the claimant's] case record." 20 C.F.R. §§ 404.1520(e), 416.920(e). A claimant's RFC is "the most [the claimant] can still do despite [the claimant's] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The claimant bears the burden of proof as to the first four steps. *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999). It is only after the claimant proves that she cannot return to work that the burden shifts to the Commissioner to show, at step five, that other work exists in the national

and local economies that the claimant can perform, given the claimant's RFC, age, education and past relevant work experience. *Id.* at 51-52.

## III.     The Treating Physician Rule[25]

Under the treating physician rule, the ALJ must give "controlling weight" to the opinion of a claimant's treating physician as to the nature and severity of the impairment as long as it "'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527(d)(2)).

"Before an ALJ can give a treating physician's opinion less than controlling weight, the ALJ should consider the following factors to determine the amount of weight the opinion should be given: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the medical support for the treating physician's opinion, (4) the consistency of the opinion with the record as a whole, (5) the physician's level of specialization in the area, and (6) other factors that tend to support or contradict the opinion." *Gonzalez v. Comm'r of Soc. Sec.*, No. 16-CV-08445 (KMK) (PED), 2017 WL 7310391, at *11-12 (S.D.N.Y. Dec. 21, 2017), *report and recommendation adopted*, 2018 WL 671261 (S.D.N.Y. Jan. 31, 2018) (internal citations omitted).

While the ALJ need not expressly address each factor, the ALJ must provide "good reasons" for the weight accorded to the treating physician's opinion. *See Atwater v. Astrue*, 512

---

[25] On January 18, 2017, the SSA promulgated a final rule that dramatically changes the nature of the evaluation of medical opinion evidence. *See Revisions to Rules Regarding the Evaluation of Medical Opinion Evidence*, 60 Fed. Reg. 5844 (Jan. 18, 2017) (codified at 20 C.F.R. §§ 404 & 416). These new regulations apply only to claims filed with the SSA on or after March 27, 2017.  Accordingly, since Plaintiff filed her claim on October 24, 2016, the Court is referring to the version of the regulations effective before March 27, 2017.

F. App'x 67, 70 (2d Cir. 2013) (summary order); *see also* 20 C.F.R. §§ 404.1527(c) (stating that the agency "will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's opinion"); *Zabala*, 595 F.3d at 409 ("The ALJ was required either to give [the treating physician's] opinions controlling weight or to provide good reasons for discounting them.").

Despite the general rule, "[t]he opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record, [including] the opinions of other medical experts." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). This is because "[g]enuine conflicts in the medical evidence are for the Commissioner to resolve." *Burgess*, 537 F.3d at 128.

## IV.    Duty to Develop the Record

Because social security proceedings are "essentially non-adversarial," the ALJ has an affirmative duty to develop the record. *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508-09 (2d Cir. 2009) (internal citation omitted); *see also Rosa*, 168 F.3d at 79 ("[W]here there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history."). An ALJ "must ensure that "[t]he record as a whole [is] complete and detailed enough to allow the ALJ to determine claimant's residual functional capacity." *Casino-Ortiz v. Astrue*, No. 06-CV-00155 (DAB) (JCF), 2007 WL 2745704, *7 (S.D.N.Y. Sept. 21, 2007) (citing 20 C.F.R. § 404.1513(e)(1)-(3)). This duty exists even if the claimant is represented by counsel. *See Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000).

The duty to develop the record is even more important when the information concerns a claimant's treating source. *See Ulloa*, 2015 WL 110079, at *11 (citation omitted). This is because

treating sources "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." *Marinez v. Comm'r of Soc. Sec.*, 269 F. Supp. 3d 207, 216 (S.D.N.Y. 2017) (citing 20 C.F.R. § 416.927(c)(2)).

## **DISCUSSION**

### I.    **The ALJ Failed To Develop The Record**

Plaintiff first argues that this action should be remanded because the ALJ failed to adequately develop the record by failing to obtain medical source statements from Plaintiff's treating sources. (Pl.'s Mem., ECF No. 23, at 13-17.) The Court agrees.

"The ALJ's failure to develop the record is a threshold issue, because 'the Court cannot rule on whether the ALJ's decision regarding [the claimant's] functional capacity was supported by substantial evidence if the determination was based on an incomplete record.'" *Craig v. Comm'r of Soc. Sec.*, 218 F. Supp. 3d 249, 267 (S.D.N.Y. 2016) (citations omitted). Under the treating physician rule, which applies here, "the opinion of a treating physician is an especially important part of the record to be developed by the ALJ." *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 343 (E.D.N.Y. 2010). However, "an ALJ's failure to request medical source opinions is not per se a basis for remand where 'the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity.'" *Russ v. Comm'r of Soc. Sec.*, No. 20-CV-

06389 (RWL), 2022 WL 278657, at *8 (S.D.N.Y. Jan. 31, 2022) (quoting *Tankisi v. Comm'r of Soc. Sec.*, 521 Fed. App'x 29, 34 (2d Cir. 2013)).

In assessing Plaintiff's RFC, the ALJ considered the 2017 opinions of non-treating, consultative examiners, Dr. Bhutwala, Dr. Herman and Dr. A. Pollack, and the opinions of non-treating, non-examining, medical experts, Dr. Savage and Dr. D. Pollack from January and June 2019, respectively. (*See* R. 17-19.) However, the record did not contain opinions from any of Plaintiff's numerous treating sources. Plaintiff's oncologist, Dr. DaCosta, submitted a disability assessment, but noted that he was unable to provide an opinion regarding Plaintiff's ability to do work-related activities. (R. 564.) It appears that the ALJ requested an opinion from Dr. Delgado, but he provided only treatment records in response. (Comm'r Mem. at 16 n.12; *see also* R. 701.) In any event, there are no records indicating that either of these doctors treated Juarez beyond January 2017. (R. 567-59, 704.) The record does not reveal any attempt by the ALJ to obtain medical opinions from other, more recent, treating sources.

For example, the record does not reflect any attempt to contact Dr. Sarnelli, who in addition to being Juarez's primary care doctor for almost two years, also treated Juarez for depression. In formulating Juarez's mental RFC, the ALJ rejected evidence from Dr. Sarnelli regarding Juarez's mental impairments (namely PHQ-9 scores indicating severe depression) on the ground that a PHQ-9 is a screening device and, thus, had limited value (R. 17), but did not attempt to further develop the record regarding the impact of Juarez's depression on her functional limitations. Later, in assigning Dr. Herman's opinion "good weight[,]" the ALJ discounted the PHQ-9 scores on the ground that Juarez was not under a physician's care for her psychiatric condition, even though those screening tests were performed by Dr. Sarnelli. (R. 17.)

In addition, Plaintiff testified in June 2019 that she had been seeing a psychiatrist, Dr. Jean Cummings, until the year prior and more recently had received psychiatric medication from Dr. Sarnelli. (R. 1089-91.) In these circumstances, the Court finds that it was not enough for the ALJ to rely on the 2017 opinions of the disability evaluator and the consultative examiner and the ALJ's failure to seek a treating physician opinion regarding the impact of Plaintiff's mental impairment on her RFC was error. *See, e.g.*, *Arteaga v. Comm'r of Soc. Sec.*, No. 19-CV-01630 (AMD), 2020 WL 4369599, at *5 (E.D.N.Y. July 29, 2020) (remanding where ALJ found plaintiff's mental impairments to be severe, yet record lacked any opinion from treating physician or source regarding the extent to which plaintiff's mental impairments affected his functional ability).

Nor does it appear that the ALJ attempted to obtain a medical opinion from Dr. Barber, Plaintiff's treating neurologist, or one of her orthopedist providers, despite Plaintiff's testimony that she actively was undergoing treatment for her knees and seeing a neurologist. (R. 1094-95; *see also* R. 52 (Dr. D. Pollack testimony that Plaintiff had "seen a neurologist fairly regularly").) The Commissioner argues that the ALJ had sufficient evidence to consider, including the opinions of two medical experts who reviewed all or nearly all the medical evidence of record, and that the ALJ was not obligated to supplement the record by acquiring a medical source statement from one of Plaintiff's treating physicians. (*See* Comm'r Mem. at 16.) However, the Court finds that there was a gap in the record that the ALJ should have attempted to fill in order to make "a fair and complete assessment of plaintiff's RFC."[26] *Hooper v. Colvin*, 199 F. Supp. 3d 796, 816

---

[26] The Commissioner notes that Plaintiff cites to the prior version of the regulations, 20 C.F.R. § 404.1512 (2015), in support of her argument that the ALJ failed to obtain a complete medical history by failing to obtain medical reports from Plaintiff's treating sources. (*See* Comm'r Mem. at 16; Pl.'s Mem. at 14.) However, the subsection relied upon by Plaintiff requiring the ALJ to make every reasonable effort to obtain medical reports from a claimant's medical sources, 20 C.F.R. § 404.1512(d) (2015), although

(S.D.N.Y. 2016) (finding ALJ's failure to obtain opinions from plaintiff's treating physicians, as well as lack of clarity in opinions that actually were obtained created "obvious gap" in record that needed to be filled in order to make fair and complete assessment of plaintiff's RFC); *accord Williams v. Kijakazi*, No. 20-CV-08469 (JLC), 2022 WL 799478, at *19 (S.D.N.Y. Mar. 16, 2022).

The ALJ relied on the opinion of Dr. Savage, but recognized that Dr. Savage did not review the entire record. (R. 18.) And the ALJ only gave "some weight" to the opinion of Dr. A. Pollack, noting that her opinion could be read to exclude or allow for sedentary work. (*Id.*) Notably, the evidence added after the January 2019 hearing (although the records themselves pre-date the hearing), include Juarez's treatment notes from Dr. Barber, Dr. Brennan and Dr. Williams and more recent physical therapy records. (R. 894, 990, 1058; *see also* R. 1079 (admitting medical evidence through Exhibit 36F during January 2019 hearing).) Thus, the opinions of Dr. Savage and Dr. A. Pollack (which, in any event, was given only limited weight by the ALJ) were not sufficient for the ALJ to assess Plaintiff's RFC.

Moreover, Dr. Barber wrote in a treatment note that Plaintiff's restless leg syndrome was "severely disabling" (*see* R. 918, 925), but the ALJ did not address this statement nor seek an opinion from Dr. Barber regarding the impact of Plaintiff's restless leg syndrome on her functional limitations. "In addition to not satisfying the duty to develop the record, a failure to make reasonable efforts to obtain [opinions of plaintiff's treating physicians] is a *de facto* violation of the treating physician rule, requiring remand." *Vargas v. Comm'r of Soc. Sec.*, No. 20-CV-04363

---

removed from the new version, still is incorporated in the new version of the rule in subsection 20 C.F.R. § 404.1512(b) (2017). Even under the new regulations, "'an ALJ must attempt to obtain medical opinions – not just medical records – from a claimant's treating physicians.'" *Williams v. Kijakazi*, No. 20-CV-08469 (JLC), 2022 WL 799478, at *17 (S.D.N.Y. Mar. 16, 2022) (citing *Skartados v. Comm'r of Soc. Sec.*, No. 20-CV-3909 (PKC), 2022 WL 409701, at *4 (E.D.N.Y. Feb. 10, 2022)).

(PKC), 2022 WL 462392, at *6 (E.D.N.Y. Feb. 15, 2022) (citing *Lacava v. Astrue*, No. 11-CV-07727 (WHP) (SN), 2012 WL 6621731, at *13 (S.D.N.Y. Nov. 27, 2012)); *see also Angelico v. Colvin*, No. 15-CV-00831 (SRU) (JGM), 2020 WL 2079113, at *7 (D. Conn. Feb. 8, 2017) ("[W]hen the treatment notes and test results from the claimant's treating physicians do not assess how the claimant's symptoms limit [her] functional capacities, remand is warranted.") (citations omitted).

On remand, the ALJ should obtain or make reasonable efforts to obtain medical source statements from Plaintiff's treating sources regarding Plaintiff's functional capacity.

**II.** **The ALJ Erred In His Evaluation Of The Medical Expert Opinions**

Even if the record were sufficiently developed, the Court finds that the ALJ erred in his evaluation of the medical expert opinions. In general, it is improper for an ALJ to assign significant weight to the findings of non-examining medical experts and where, as here in the case of Dr. Savage, the opinion of a medical expert is based on an incomplete record, that opinion alone cannot be considered substantial evidence. *See Avila v. Comm'r of Soc. Sec. Admin.*, No. 20-CV-01360 (ER) (DF), 2021 WL 3774317, at *20 (S.D.N.Y. Aug. 9, 2021), *report and recommendation adopted*, 2021 WL 3774188 (S.D.N.Y. Aug. 25, 2021*); see also Pratts v. Chater*, 94 F.3d 34, 38 (2d Cir. 1996) (expert opinion based on incomplete medical history offered "no basis to find the substantial evidence necessary to uphold the ALJ's decision"). Moreover, here, the Court finds that the ALJ erred by giving "significant weight" to Dr. Savage's opinion despite the fact that he initially confused Plaintiff with a different claimant, stated that he did not write complete enough notes, did not address Plaintiff's mental impairments and did not review the entire record. *See, e.g.*, *Roman v. Astrue*, No. 10-CV-03085 (SLT), 2012 WL 4566128, at *16 (E.D.N.Y. Sept. 28, 2012)

(finding ALJ erred in assigning significant weight to non-examining medical expert who "did not appear to have a strong grasp of the administrative record").

In addition, the ALJ erred in his consideration of Dr. D Pollack's opinion. The ALJ did not explain how he considered Dr. D. Pollack's opinion, except to say that he "agreed" with her opinion that Plaintiff could perform sedentary work. Significantly, the ALJ rejected Dr. D. Pollack's opinion that Plaintiff equaled Listing 11.02 for epilepsy, finding that Plaintiff did not have the requisite amount of seizures. (*See* R. 18.) However, Dr. D. Pollack testified that her opinion was not based on the number of seizures, which she acknowledged did not meet the Listing, but on her opinion that Plaintiff's "episodic neurological problems" equaled the Listing. (R. 53.) The ALJ did not point to any medical opinion or evidence in the record that was inconsistent with Dr. D. Pollack's opinion or cite to anything in support of his conclusion that there was "nothing sufficiently unique" about Plaintiff's case to justify a finding that she equaled Listing 11.02. On remand, in addition to developing the record, the ALJ should further explain his evaluation of the medical opinion evidence in the record in accordance with the applicable regulations.[27]

## CONCLUSION

For the reasons set forth above, Plaintiff's motion is GRANTED, and the Commissioner's cross-motion is DENIED. The case is remanded for further proceedings consistent with this Opinion and Order. The Clerk of Court is respectfully requested to enter judgment.

---

[27] Given that remand is warranted due to legal error, the Court declines to address Plaintiff's remaining arguments regarding the RFC determination.

**SO ORDERED.**

Dated:        New York, New York
              August 25, 2022

_____
STEWART D. AARON
United States Magistrate Judge